IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HOLLY FARRELL,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 04-3877 |
| | : | |
| **PAUL SVINDLAND,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 05-417 |
| | : | |
| **ROBERT DADDIO,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 05-441 |
| | : | |
| **KATHLEEN REGER,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 05-661 |
| | : | |
| **THE A.I. DUPONT HOSPITAL FOR** | : | |
| **CHILDREN OF THE NEMOURS** | : | |
| **FOUNDATION,** *et al.* | : | |

**MEMORANDUM AND ORDER**

**Schiller, J.**                                                                                                                 **May 5, 2006**

Plaintiffs are the parents and natural guardians of infants born with serious heart conditions. Sadly, all the infants who are the subject of the above-captioned cases have died. Plaintiffs filed numerous lawsuits in this District, four of which are currently on this Court's docket. Defendants include the A.I. DuPont Hospital for Children ("DuPont"), where the children were treated, the Nemours Foundation, as well as the infants' medical providers. The Complaints include numerous claims, including fraud, conspiracy, wrongful death, and negligence. Each Plaintiff also includes a claim under the Rehabilitation Act, 29 U.S.C. § 794 (2005). The parties have engaged in extensive discovery, and the Court has conducted numerous conferences to aid the process. Defendants now move for partial summary judgment, seeking to eliminate Plaintiffs' Rehabilitation Act claims.[1] For

---

[1] Plaintiffs have dropped their Rehabilitation Act claims against all Defendants except Dr. Norwood, DuPont, and the Nemours Foundation. (Pls.' Daddio Summ. J. Resp. Br. at 2.) Because Defendants' motions and Plaintiffs' responses are identical for purposes of deciding the

the reasons below, the Court grants the motions.

I.  **BACKGROUND**

The majority of the facts pertaining to Plaintiffs' claims will need to be determined by a jury. Nonetheless, the facts surrounding the Rehabilitation Act claim are relatively few and not in dispute.

These cases arise from the tragic deaths of four infants: Ashley McCardle, Ian Svindland, Michael Daddio, and Nicholas Reger. All four were afflicted with serious congenital heart defects requiring surgery. Plaintiffs sought treatment for their children, and the four infants were treated at the Nemours Cardiac Center ("the Cardiac Center"). Dr. William Norwood was the primary surgeon who operated on all four babies. (Farrell Second Am. Compl. ¶ 6; Svindland Compl. ¶ 5; Daddio Compl. ¶ 5; Reger Compl. ¶ 6.)

The Nemours Foundation was established by Alfred I. DuPont in 1935. (Pls.' Daddio Summ. J. Resp. Ex. 15 [Document entitled "The Deal" describing purpose and organization of the Cardiac Center].) Its purpose was to provide health care to children in Delaware. (*Id*.) To further that goal, the Nemours Foundation built the A.I. DuPont Hospital for Children in the early 1980s. (*Id*.) The Cardiac Center was set up in 1997 as a separate operating entity of the Nemours Foundation, apart from DuPont and answerable to the vice-president for physician practices. (Pls.' Daddio Summ. J. Resp. Ex. 4 [Ferry Dep.] at 26-27, 86.) The Cardiac Center adopted some policies distinct from those of DuPont, such as utilizing different pay scales than DuPont. (Ferry Dep. at 67-68.)

Dr. Norwood is a well-known cardiac surgeon. (Pls.' Daddio Summ. J. Resp. Ex. 3 [Walsh

---

summary judgment motions, the Court will treat the motions in all four cases in one Memorandum and Order.

Dep.] at 44-45 & Ex. 9 [Doughty Dep.] at 35-36.)  Prior to performing surgery at the Cardiac Center, Dr. Norwood operated a heart surgery clinic in Switzerland, but, in the late 1990s, he sought an opportunity that would allow him to return to the United States.  (Walsh Dep. at 22-26, 65; Doughty Dep. at 70.)  Meanwhile, DuPont was searching for a cardiac surgeon to develop "a premier national and international congenital cardiac program for The [Nemours] Foundation, and to do good works." (Pls.' Daddio Summ. J. Resp. Ex. 15.)  John Thomas Walsh, who helped start the heart hospital in Switzerland where Dr. Norwood worked, contacted Dr. Robert Kettrick, the chief executive of the Nemours Children's Clinic in Jacksonville, Florida, about opportunities for Dr. Norwood in Florida because Dr. Norwood wished to be closer to his son.  (Walsh Dep. at 68-69; Pls.' Daddio Summ. J. Resp. Ex. 8 [Kettrick Dep.] at 28-29.)  Dr. Kettrick reported that the Nemours Foundation was not looking to start a program in Florida but might be interested in starting one in Wilmington, Delaware.  (Kettrick Dep. at 29.)  Dr. Kettrick then initiated discussions with Dr. Robert Doughty from DuPont about Dr. Norwood's interest in returning to the United States.  (*Id.*)  Walsh informed Dr. Kettrick that Dr. Norwood would be interested in working in Wilmington with the understanding that a program in Florida was planned for the future.  (*Id.* at 29-30.)  Dr. Kettrick then traveled to Switzerland to watch Dr. Norwood operate.  (*Id.* at 30-31.)  Convinced of his skill, Dr. Kettrick reported back to Dr. Doughty on Dr. Norwood's surgical ability and desire to return to the United States.  (*Id.* at 31.)

      Discussions among Dr. Norwood and representatives for the Nemours Foundation and DuPont commenced and an agreement was reached.  (Doughty Dep. at 75-76; Kettrick Dep. at 39-40.)  Dr. Norwood was named Director of the Cardiac Center and was responsible only to W. Jeff Wadsworth, the general manager (and later president) of the Nemours Foundation, and to Dr.

Doughty, the vice-president of physician practices.[2]  (Pls.' Daddio Summ. J. Resp. Ex. 15; Pls.' Daddio Summ. J. Resp. Ex. 19 [Proujansky Dep.] at 22; Doughty Dep. at 115.)  Dr. Norwood was granted "complete and independent authority and responsibility to hire, fire, organize and direct all personnel of the [Nemours Cardiac Center] in Delaware and Florida including but not exclusive of all physicians, nurses, technicians, researchers and administrators."  (Pls.' Daddio Summ. J. Resp. Ex. 15.)  Dr. Norwood was allowed to establish policies for the Cardiac Center provided they were consistent with significant policies that affected DuPont or the practice, as determined in collaboration with Dr. Doughty, and Thomas Ferry, the CEO of DuPont and vice-president for Hospital Operations of Nemours.  (Doughty Dep. at 90-91; Ferry Dep. at 13.)

Dr. Norwood demanded autonomy and oversight of the Cardiac Center to avoid bureaucratic hassles.  (Doughty Dep. at 78.)  Dr. Norwood also insisted on meeting directly with the CEO of DuPont "so that if there were problems at [DuPont] of getting something done, he had the CEO's ear and the CEO could get whichever one of the chief executives was not doing the things he needed to get out of the way."  (*Id*. at 79.)  Furthermore, according to Plaintiffs, the Nemours Foundation employed special credentialing standards when staffing the Cardiac Center.  (Pls.' Daddio Summ. J. Resp. Br. at 20.)  These unique standards helped Dr. Norwood evade oversight from DuPont and avoid federal regulations regarding the care of disabled patients.  (*Id*.)  The standards were also a step towards segregating children with heart defects from those without heart defects.  (*Id*.)

---

[2] Dr. Norwood later reported to Dr. David Bailey after Dr. Bailey succeeded Dr. Doughty as vice-president of physician practices.  (Ferry Dep. at 26-27.)

4

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party makes such a demonstration, then the burden shifts to the nonmovant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial. *Id.* at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

When evaluating a motion brought under Rule 56(c), a court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). A court must, however, avoid making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    DISCUSSION

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, forbids federally-funded state programs from discriminating against disabled individuals based solely on their disability.  In

relevant part, the statute states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal assistance . . . ." 29 U.S.C. § 794(a). To establish a claim under the Rehabilitation Act, a plaintiff must prove: (1) that he or she is a disabled individual under the Rehabilitation Act; (2) that he or she is "otherwise qualified" for the position sought; (3) that he or she was excluded from the position sought, denied the benefits of, or subjected to discrimination under the program or activity "solely by reason of his [or her] [disability];" and (4) that the program or activity in question receives federal financial assistance.[3] *See Wagner v. Fair Acres*, 49 F.3d 1002, 1009 (3d Cir. 1995); *see also Nathanson v. Med. College of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991).

The parties have widely divergent views of the basis for the Rehabilitation Act claims. Defendants, relying largely on the allegations contained in Plaintiffs' Complaints, believe that the Rehabilitation Act claims center around the different treatment infants at the Cardiac Center received compared to the treatment received by those infants treated outside the Cardiac Center because they did not have heart defects. (Defs.' Daddio Summ. J. Br. at 3.)

Plaintiffs counter that the Defendants violated the Rehabilitation Act because the "scheme

---

[3] Plaintiffs drop a footnote contending that recent amendments to the Rehabilitation Act have incorporated the liability standards from the Americans with Disabilities Act and therefore they need not prove that the discrimination was solely the result of the handicap but merely "because of" the handicap. (Pls.' Daddio Summ. J. Resp. at 42 n.12.) Even a cursory reading of the statute upon which Plaintiffs rely for this contention, 29 U.S.C. § 794(d), reveals that their argument is valid only "in a complaint alleging employment discrimination under this section." 29 U.S.C. § 794(d). As Plaintiffs' Rehabilitation Act claim does not allege employment discrimination, Plaintiffs must establish that the disability was the sole reason for the discrimination. *See, e.g.*, 29 U.S.C. § 794(a); *Strathie v. DOT*, 716 F.2d 227, 230 (3d Cir. 1983); *New Directions Treatment Servs. v. City of Reading*, 415 F. Supp. 2d 501, 513-14 (E.D. Pa. 2005).

of care and management" that existed at the Cardiac Center did not exist elsewhere at DuPont. (Pls.' Summ. J. Resp. at 3.) This scheme, created to accommodate the Cardiac Center and Dr. Norwood, permitted a pervasive sense of autonomy, lack of oversight and absence of control that violated the Rehabilitation Act. (*Id*.) The Nemours Foundation's efforts to lure and retain Dr. Norwood resulted in an environment devoid of "essential protections" for those children admitted to the Cardiac Center. (*Id*. at 43.) To bolster their claims, Plaintiffs contend that Dr. Norwood demonstrated great disdain for the concepts of informed consent and government regulations in the healthcare industry. (*Id*. at 7-8.)

Defendants posit three reasons why Plaintiffs' Rehabilitation Act claims must fail. First, they argue that none of the children were denied access to any treatment. (Defs.' Farrell Summ. J. Br. at 7-8; Defs.' Svindland Summ. J. Br. at 7-8; Defs.' Daddio Summ. J. Br. at 4-5; Defs.' Reger Summ. J. Br. at 7-8.) Second, Defendants argue that the Rehabilitation Act does not apply to the medical decisions of health care providers. (Defs.' Farrell Summ. J. Br. at 10-13; Defs.' Svindland Summ. J. Br. at 10-13; Defs.' Daddio Summ. J. Br. at 7-10; Defs.' Reger Summ. J. Br. at 10-13.) Third, Defendants argue that none of the children were excluded from any program for which they were "otherwise qualified." (Defs.' Farrell Summ. J. Br. at 8-10; Defs.' Svindland Summ. J. Br. at 8-10; Defs.' Daddio Summ. J. Br. at 5-7; Defs.' Reger Summ. J. Br. at 8-10.) The Court addresses each of these arguments in turn.[4]

---

[4] Defendants do not contest that Ashley, Ian, Michael and Nicholas qualify as disabled under the Rehabilitation Act. The status of the children as disabled is beyond question. *See* 29 U.S.C. § 705(20) (defining "individual with a disability" as one who: (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment); *see also Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 624 (1986) (definition of handicapped individual includes an infant born with a congenital defect).

### A.     Plaintiffs Have Presented No Evidence of Exclusion, Denial, or Discrimination

To establish a claim under the Rehabilitation Act, Plaintiffs must prove that their disabled children were excluded from the position sought, denied the benefits of, or subjected to discrimination under a program or activity solely because of the disability. *See Wagner*, 49 F.3d at 1009. The Court is at a loss as to exactly what program or activity the Plaintiffs' children were excluded from, denied access to or discriminated under, regardless of whose theory of the case is credited. The facts make clear that these infants suffered from serious heart defects. These children were all treated at the Cardiac Center by a doctor trained to perform heart surgery on infants. Plaintiffs have not put forth any alternative place of treatment and offer no possible explanation why treating children with serious heart issues at a cardiac center constitutes any type of denial, exclusion, or discrimination. According to Plaintiffs' Complaints, their children were discriminated against because the procedures for cooling and anesthetizing children with heart defects differed from those used to cool and anesthetize other children with non heart-related medical issues. (Farrell Second Am. Compl. ¶ 145; Svindland Compl. ¶ 148; Daddio Compl. ¶ 166; Reger Compl. ¶ 147.) Furthermore, Plaintiffs assert, the doctors in the Cardiac Center were granted such autonomy that children treated in the Cardiac Center were in essence segregated and subjected to a lesser standard of care solely because these children had heart defects. (Farrell Second Am. Compl. ¶ 148; Svindland Compl. ¶ 152; Daddio Compl. ¶ 172; Reger Compl. 151.)

But Plaintiffs' children were all placed under anesthesia prior to surgery by qualified anesthesiologists and remained in the care of medical providers with the skills and qualifications necessary to perform pediatric heart surgeries. In essence, Plaintiffs' Rehabilitation Act allegations simply reiterate their medical malpractice claims. Plaintiffs' children were not discriminated against

based on their heart conditions; rather they were admitted to the Cardiac Center because of their need for specialized care. Plaintiffs have failed to present any evidence that the medical professionals at the Cardiac Center were unqualified to perform the procedures undertaken on Plaintiffs' children or that the standard of care at the Cardiac Center fell below some minimal standard because of the children's disability.

While Plaintiffs tailor bits and pieces of deposition testimony to weave a story of deceit and conspiracy involving an autonomous heart hospital run amok, conspicuously absent from the evidence is a single word or utterance that could possibly give rise to an inference that any of these infants were discriminated against because they had congenital heart defects. It should come as no surprise that the operation and functionality of the Cardiac Center would affect those with heart troubles as opposed to those suffering from other ailments. But that by no means establishes discriminatory conduct based upon the patients' heart troubles. Regardless of the negative outcomes of individual surgeries and treatments – matters best left to a jury – the Cardiac Center was conceived to help those infants with severe heart problems. In fact, deposition testimony cited by Plaintiffs asserts that Dr. Norwood sought to be personally responsible and accountable for the entire program because it "tended to promote a higher quality." (Pls.' Daddio Summ. J. Resp. Ex. 17 [Wadsworth Dep.] at 40.) The Court declines to apply the label of discrimination to any potential mistakes made in setting up the Cardiac Center.

Plaintiffs also refer to a litany of governmental findings that cite numerous deficiencies with policies and procedures in place at the Cardiac Center. (*Id*. at 21-31.) At this stage, the Court need not address the probative value these findings may have on other claims Plaintiffs assert against the Nemours Foundation, DuPont and Dr. Norwood. For purposes of resolving the present motions, the

Court is satisfied that these findings have no relevance to Plaintiffs' Rehabilitation Act claims and contain no evidence of discrimination.

### B.     The Rehabilitation Act Does Not Apply to Medical Decisions

In *United States v. University Hospital*, the Second Circuit considered whether § 504 of the Rehabilitation Act authorized the Department of Health and Human Services (HHS) to obtain access to a hospital's medical records regarding a deformed newborn whose parents refused to consent to surgical procedures that could have prolonged the infant's life. 729 F.2d 144, 146 (2d Cir. 1984). The Second Circuit conducted a thorough review of the legislative history of § 504 and concluded that HHS was not entitled to the records because Congress did not intend § 504 to reach medical decisions related to the treatment of handicapped persons. *Id*. at 161. The Second Circuit found no evidence that Congress intended § 504 apply to medical treatment decisions concerning disabled newborns; rather congressional policy supported the notion that federal personnel were best left out of such medical treatment decisions. *Id*. at 157-161. In other words, § 504 was never aimed at medical treatment decisions. *See Toney v. U.S. Healthcare Inc.*, 838 F. Supp. 201, 203-204 (E.D. Pa. 1993); *see also Lesley v. Chie*, 81 F. Supp. 2d 217, 224 (D. Mass. 2000).

The complexity of pediatric heart surgery is not in dispute. (Defs.' Daddio Summ. J. Mot. Ex. A [Norwood Dep.] at 46 (describing complex nature of congenital heart disease at issue in this litigation).) These infants faced life-threatening heart conditions that required medical providers to make complicated decisions regarding their treatment. (*Id*. at 44.) Nor do the parties dispute that the surgical team at the Cardiac Center operated on and treated the infants, although Plaintiffs allege that such treatment fell below the required standard of care.

Plaintiffs contend that the Rehabilitation Act claims stem not from the medical decisions

regarding these children, but instead from the administrative decisions to set up the Cardiac Center in a way that evaded oversight and control by DuPont.[5] By asserting that their claims are based upon administrative decisions, Plaintiffs aver that this case is similar to *Wagner v. Fair Acres*. (Pls.' Summ. J. Resp. at 42-43.) The Court disagrees. *Wagner* involved a decision on whether a particular nursing home could provide certain services and care required by a patient suffering from Alzheimer's disease. *Wagner*, 49 F.3d at 1012.  Plaintiffs' cases involve the proper techniques and methods for operating a pediatric cardiac center, not whether these infants were appropriately placed in the Cardiac Center, a fact Plaintiffs concede. (Pls.' Summ. J. Resp. at 3 ("No one has alleged that Plaintiffs' children should have been treated *outside* a specialized care center such as the cardiac center . . . .").)  Decisions regarding the proper techniques and methods for operating a pediatric cardiac center are best left to experts in the field, not courts.  Plaintiffs' contention is not merely that the Cardiac Center was established in such a way as to avoid oversight, but that its structure created an environment whereby experimental medical procedures and dangerous cooling and anesthesia techniques were used on infants.  Obviously, decisions regarding anesthesia and cooling techniques are medical decisions related to patient treatment.  *See Wagner*, 49 F.3d at 1012.  While an examination of complex medical decisions is commonly made with respect to negligence claims, such medical decisions are removed from the purview of the Rehabilitation Act.

Additionally, to the extent that there is any overlap between medical decisions and administrative decisions regarding the operation of the Cardiac Center, Plaintiffs' Rehabilitation Act claims still must fail.  Plaintiffs have cited to nothing that shows *any* discrimination, let alone

---

[5] Defendants correctly point out that the Rehabilitation Act claims in Plaintiffs' Complaints rely on allegations that the Cardiac Center employed different medical techniques and treatments than those used at DuPont. (Defs.' Daddio Summ. J. Br. at 3.)

discrimination based upon the heart defects from which these infants suffered. Plaintiffs suggest that the Cardiac Center was set up to avoid oversight and control by DuPont for the primary purpose of attracting a well-known pediatric cardiologist who would bring patients to the Cardiac Center and revenue to DuPont. Of course, these objectives have nothing to do with the affliction from which these infants suffered. Nothing in the record demonstrates that these infants were discriminated against because of their heart conditions. Rather, only children with heart problems were affected by decisions regarding the Cardiac Center because the Cardiac Center only treated those children with heart troubles. Plaintiffs' claim, taken to its logical conclusion, would create a Rehabilitation Act claim for any decision regarding speciality practices because that decision would necessarily affect only individuals suffering from a particular disease or medical condition. The Court finds no basis to stretch the Rehabilitation Act to such lengths.

Finally, the Court finds Plaintiffs' argument that the Cardiac Center was set up to avoid oversight to be unsupported by the record. Without question, Dr. Norwood was given great autonomy to run the Cardiac Center. The Nemours Foundation spent considerable resources in wooing Dr. Norwood, whom they viewed as a world-class cardiac surgeon, to their new facility in an effort to get the program off the ground. Despite affording Dr. Norwood great authority over the Cardiac Center, it was understood that the Cardiac Center could not "operate in a total vacuum. It has to be part of a hospital. It has to comply with certain regulations. . . . And so it had to be cooperative, even though it was a relatively autonomous team." (Doughty Dep. at 81; *see also id*. at 85.)

Dr. Norwood operated the Cardiac Center in what has been termed a "programmatic approach." (Walsh Dep. at 52-53.) Walsh described the approach as follows:

12

> A programmatic approach is just putting a team together that concentrates on solely the care of kids with congenital heart disease and trying to make sure that nothing – it's – it's an effort to make quality of care better because nothing falls through the cracks. . . . I mean the anesthesiologist, the cardiologist, even the technicians, nurses, they're all – like 20 people going on rounds, so that everybody knows everything about every child that's being taken care of at every level and that's sort of the programmatic approach.

(*Id*. at 53-54.) Again, the set up and operation of the Cardiac Center as well as Dr. Norwood's approach to treating infants with congenital heart defects is not evidence of discrimination. Accordingly, Plaintiffs' Rehabilitation Act claims must fail.

### C.     The "Otherwise Qualified" Requirement

The Third Circuit has addressed the meaning of "otherwise qualified" under the Rehabilitation Act. *Wagner*, 49 F.3d at 1009-12. An "otherwise qualified" disabled person "is one who can meet all of a program's requirements in spite of his [or her] handicap." *Id*. at 1009. As one court has noted, "[t]he 'otherwise qualified' language, when considered in conjunction with the 'solely' language of the third condition, poses a formidable obstacle for anyone alleging discrimination [under the Rehabilitation Act] based upon the failure to receive medical treatment for a birth defect." *Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992). This is because, ordinarily, one seeking medical treatment as a result of a disability would not need the treatment but for the disability. *Id*. Therefore, "[w]here the handicapping condition is related to the (conditions) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory.'" *Univ. Hosp.*, 729 F.2d at 157. Nonetheless, in *Wagner*, the Third Circuit directed that the appropriate focus is not on the reason for seeking access to an institution, but rather on the reason an individual was denied access to the institution. *Id*. at 1010.

Plaintiffs argue that their Rehabilitation Act claims are not related to any failure to receive

13

medical treatment but rather on the Cardiac Center's structure. However, while *Wagner* might suggest that a disabled individual is not foreclosed from being considered "otherwise qualified" because the handicap is related to the condition for which treatment is sought, the Third Circuit also recognized that it was not faced with "medical treatment cases involving handicapped infants which necessitate complex assessments of the medical needs, benefits and risks of providing invasive medical care . . . ." *Id*. at 1012. That is precisely the issue faced by this Court here. However, because Plaintiffs have failed to raise a genuine issue of material fact that their children were discriminated against, the Court leaves the issue of the applicability of the "otherwise qualified" requirement for another day .

## IV.  CONCLUSION

While the death of these infants was tragic, Plaintiffs' Rehabilitation Act claims are not viable. Therefore, the Court grants to Defendants summary judgment on Plaintiffs' Rehabilitation Act claims and dismisses those claims. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HOLLY FARRELL,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 04-3877 |
| | : | |
| | : | |
| **PAUL SVINDLAND,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 05-417 |
| | : | |
| | : | |
| **ROBERT DADDIO,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 05-441 |
| | : | |
| | : | |
| **KATHLEEN REGER,** *et al.* | : | CIVIL ACTION |
| v. | : | NO. 05-661 |
| | : | |
| **THE A.I. DUPONT HOSPITAL FOR CHILDREN OF THE NEMOURS FOUNDATION,** *et al.* | : | |

## ORDER

**AND NOW**, this **5th** day of **May, 2006**, upon consideration of Defendants' motions for partial summary judgment, Plaintiffs' responses thereto, Defendants' replies thereon, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Defendants' Motions to File a Reply Brief (Farrell Document No. 82; Svindland Document No. 33; Daddio Document No. 37; Reger Document No. 32) are **GRANTED**.

2. Defendants' partial motions for summary judgment (Farrell Document No. 77; Svindland Document No. 27; Daddio Document No. 30; Reger Document No. 26) are **GRANTED**.

3. All Rehabilitation Act claims against all Defendants are **DISMISSED**.[6]

**BY THE COURT:**

*[signature]*

_____
**Berle M. Schiller, J.**

---

[6] Jurisdiction in the Svindland and Daddio litigations is premised solely on the federal question presented by the Rehabilitation Act. Anticipating that the Rehabilitation Act claim might not survive, the Court ordered briefing on whether dismissal of that claim would require dismissal of the Svindland and Daddio cases. The parties briefed the issue and, in accordance with this Court's earlier pronouncement to the parties, the Court can and will retain jurisdiction over the Svindland and Daddio cases.